UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERROL HINTON,

        Petitioner,

v.                                                            CASE NO. 08-CV-10712
                                                            HONORABLE VICTORIA A. ROBERTS

MICHIGAN PAROLE BOARD,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS,
AND DENYING A CERTIFICATE OF APPEALABILITY
AND LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I. INTRODUCTION**

Errol Lashone Hinton ("Petitioner"), a Michigan parolee, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court criminal convictions.

Petitioner was convicted of assault with intent to commit great bodily harm less than murder, and possession of a firearm during the commission of a felony following a bench trial in the Wayne County Circuit Court. He was sentenced to 10 months to 10 years imprisonment on the assault conviction, and a consecutive term of two years imprisonment on the felony firearm conviction.

In his pleadings, Petitioner raises claims concerning the trial court's factual findings and the effectiveness of appellate counsel.

For the reasons stated, the Court denies the petition for a writ of habeas corpus. The Court also denies a certificate of appealability and leave to proceed *in forma pauperis* on appeal.

**II. FACTS AND PROCEDURAL HISTORY**

Petitioner's convictions arise from a shooting which occurred outside a wedding reception on May 12, 2002 in Detroit, Michigan. The trial court summarized the trial testimony as follows:

1

The victim, Mr. Peter Anderson, was the first witness. He never mentioned the flight [sic] in the reception as he talks only about what happened after the reception was being broken up. Doesn't happen to mention, as Mr. Green testified, that it was because it was getting out of hand, possibly largely, according to Mr. Green, due to Mr. Anderson's behavior. But his testimony about the incident that is in question here, he says, as he exited, he sees his brother with eight to ten guys, his brother Patrick who tells him to leave. He doesn't leave. And then Mook, who he has identified as being Mr. Spencer, and Sho who is Mr. -- and then Mook grabs the gun from Sho who is identified as Mr. Hinton. And he says as Peter -- he tries to run, Mook shoots the gun at him four times. He's shot in the lower back. The bullet he discovers eventually went through his lungs and liver and he's also wounded in the right leg which went through to his left leg. He said he's able to keep running, goes about a half block and he sees his friends Kenyuano Jones and Andre Jones in a truck, yells for them to stop, and they take him to a hospital. He indicates that he never had a knife. He also testified that he never went out and was asked out and came back. And that Sho grabbed the gun with his right hand, reached across his body and gave it to Mook. He testified that, when he went to the police, he said that it was Mr. Spencer who shot him and he said he went to the police after he spent about a month-and-a-half in a coma. He went to police the next day. He said it was Mr. Spencer who shot him.

At the 36th District Court, when he saw Sho, Mr. Hinton, he told someone -- I can't recall if it was an officer or a prosecutor or what -- and Mr. Hinton was arrested at that time. Mr. Kenyuano Jones testified that, I believe that he is a friend of all of them. He is a school teacher. He testified that he saw Peter at the party and that – let me go back to my notes here. He saw the victim at the party and then about 1:30 a.m. he saw the victim, that is Mr. Anderson, running to Mr. Jones' car screaming for him to stop and he said that the thing -- he said that the victim seemed to be afraid; that he got in the vehicle with Mr. Kenyuano Jones' brother, Andre Jones and the cousin. The victim at that time said to him, "Take me to the hospital. Mookie shot me." The witness said he's known Mookie, Mr. Spencer, for 16 or 17 years. He doesn't know Sho personally, but he has seen him. He did not contact the police himself but an inspector called him at the job and asked him some questions, but he didn't go himself. And he also testified that at the reception Mr. Anderson was drunk or -- yeah, he was drunk.

The witness Mr. Kenyuano Jones also saw Sho and Mook at the wedding. He doesn't remember what they were wearing. Since he's a school teacher, he sees a lot of clothes, but he did not see a gun at the reception.

Andre Jones testified that he -- basically the same as Kenyuano Jones. He saw that at the, about -- let's see, at about 1:30 a.m. as he was leaving the wedding with his brother Kenyuano and his cousin Corey Jones and a Marcus Bayne and his brother was driving and they saw the victim hollering and running and he said he was shot. He was grabbing his leg and squeezing it with his hand. He got in the vehicle next to Mr. Anderson. Andre Jones who was in the back. He was grabbing his leg and

2

squeezing it with his hand and he said Mookie shot him. They took the victim, that's Mr. Anderson, to Henry Ford Hospital and he didn't tell anyone, including the police. He said they all were having a good time and there was some arguing, fighting and pushing and Mr. Anderson and some other people were arguing and fighting and about 15 or 20 minutes later he saw Mr. Anderson run to the truck.

The next witness was Mr. Patrick Anderson who is Peter's brother and Patrick indicated that, as Patrick was leaving the reception, he came into contact with Sho and Mookie. Mookie was at Sho's side. Peter came out shortly after -- well, he actually said about the same time as Patrick and Mook and Peter get to fighting about two minutes. Then another guy tells Mook to, quote, shoot those niggers, and then the fight breaks up and Patrick tells Peter to leave and, as Peter tries to leave, Sho gives Mook the gun and Mook shot at Peter several times. Once Mook shot, Peter ran. And he said that he and then Sho stood there and asked him why bring your gun to the wedding. They shared a cigar. He said he stayed because he saw him running and Kenyuano had picked him up. He said that there was, in fact, a fight at the wedding reception between Peter and Mook's older brother and Peter told him Mook's older brother had stabbed him inside the hall. Then Patrick said Mook got the gun from Sho who pulled it out from under his jacket and handed it to Mook.

When Peter was re-called, he testified that there was a fight and a guy jugged a knife at him and he got a puncture wound. Then with the admission of the medicals, the [prosecution] rested and defense witness Mr. Timothy Cook who I've dubbed the entertainer. In fact, I think he called himself the entertainer.

* * *

Mr. Timothy Cook was the first witness for the defense and he is the entertainer, by his own testimony, and he was there to do the entertainment and he knows both the defendants and Peter Anderson most of his life. He talks about the confrontation at the reception and Peter swinging a bottle and hitting the guy in the face. Contrary to Peter's testimony, he said that Peter was, in fact, escorted out. And then he says he went out and came back and says eventually everyone left. He was outside with what he called my group: Derrick, Sho who he called Shawn and Byron or Brian. He says Derrick's hand flew up and Peter stabbed him over Patrick's shoulder and they took Derrick to the hospital. He never saw Sho give Mook a gun, he never saw a gun. He said Sho or Shawn is his cousin. Peter was the only one who was rowdy at the [reception]. He doesn't know the person who was hit by the bottle and all he did after the stabbing was call 911 and take Derrick to the hospital. Never saw the shooting. But by his testimony obviously he says that Derrick was either in the car or on his way to the car when the shooting occurred. And he didn't tell the police anything about anything either. But he came to testify because he got information from his grandmother that Peter had changed his testimony but his cousin Sho didn't call him.

Then we had Mr. Green who added not a lot because he didn't [sic] -- was clear that he didn't see the shooting. He talked a lot about what went on in the wedding, about Peter's behavior and -- but he was inside and he never saw the -- when the shooting

3

> occurred, and he never saw anything that happened outside. He took him out -- he actually says he took Peter out twice. He spoke to Sho a few days after, but Sho never mentioned the stabbing or that he took Mook to the hospital. He said Mook called him, Mr. Green, Charles, the next day to tell him Peter had stabbed him but Sho never mentioned it.
>
> Byron Cook who is a neighbor and apparently was standing there at the time with Mook and Sho, according to Timothy, part of his group, never mentioned the incident even though he saw him within a week the incident. Byron Cook, who apparently is Timothy's uncle, he's an acquaintance of Peter's but a friend of Derrick I'm sorry, Errol Spencer and Errol Hinton -- and Shoo Hinton. I misspoke. He says Peter was to his right at the entrance of the reception and they were trying to calm him down. Later he saw him arguing with some guys. Peter threw a bottle. Peter was put out a couple of times. Later Hinton, Spencer, Byron and other friends were talking with Patrick. It was friendly. Then Peter came to the area, reached out over Patrick's shoulder and stabbed him. Spencer faded back and they walked him to his car and put him in the car and then he heard the gunshots. He never saw anyone hand any gun to Spencer. According to him, Spencer was being walked to the car..

Waiver Trial Tr., Vol. II, pp. 24-31.

Acknowledging that the case boiled down to a credibility contest, the trial court decided that the victim and the other prosecution witnesses were more credible than the defense witnesses. The court found Petitioner guilty as an aider and abettor of assault with intent to commit great bodily harm less than murder, and felony firearm. The trial court sentenced Petitioner to consecutive terms of 10 months to 10 years imprisonment, on the assault charge, and a consecutive two year sentence on the gun charge.

Petitioner, through counsel, filed an appeal as of right with the Michigan Court of Appeals raising sentencing issues. The Michigan Court of Appeals affirmed Petitioner's convictions and sentence. *People v. Hinton*, No. 252544, 2005 WL 602565 (Mich. Ct. App. March 15, 2005) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Hinton*, 474 Mich. 904, 705 N.W.2d 122 (2005).

Petitioner then filed a motion for relief from judgment with the trial court asserting that the trial court mis-characterized the trial testimony and that appellate counsel was ineffective for failing

4

to raise the issue on direct appeal. The trial court found that Petitioner failed to establish the requisite cause and prejudice to be entitled to relief under state law, and denied the motion in an opinion dated April 24, 2006. Petitioner then filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Hinton*. No. 271652 (Mich. Ct. App. Jan. 31, 2007) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied because Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Hinton*, 478 Mich. 929, 732 N.W.2d 927 (2007).

Petitioner then filed this habeas petition, raising the same two issues presented to the state courts in his motion for relief from judgment and related appeals. Respondent's answer to the petition contends that it should be denied, because the claims are barred by procedural default and/or lack merit.

### III. STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., govern this case because Petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. "In order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the Supreme Court's holdings, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an

issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

Lastly, this Court must presume that state court factual determinations are correct. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### IV. ANALYSIS

Petitioner says that he is entitled to habeas relief because the trial court mis-characterized the trial testimony, and appellate counsel was ineffective for failing to raise the issue on direct appeal. Respondent contends that the claim challenging the trial court's factual findings is barred by procedural default because Petitioner first raised it in his motion for relief from judgment and the state courts denied relief pursuant to Michigan Court Rule 6.508(D). Respondent also contends that the claim lacks merit, as does the ineffective assistance of appellate counsel claim.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). The last *explained* state court judgment should be used to make this determination. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing

7

court relied upon the last reasoned opinion. *Id*.

Petitioner first properly presented his habeas claims to the state courts in his motion for relief from judgment. The state trial court, the Michigan Court of Appeals, and the Michigan Supreme Court each denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. *See* Mich. Ct. R. 6.508(D)(3). The Michigan Supreme Court's decision, while brief, was based upon an independent and adequate state procedural rule. *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000) (Michigan Supreme Court's citation to MCR 6.508(D) to deny relief constitutes a reasoned decision invoking a procedural bar); *see also Guilmette v. Howes*, _ F.3d _, 2010 WL 86339, *3 (6th Cir. Jan. 12, 2010) (relying on *Munson v. Kapture*, 384 F.3d 310 (6th Cir. 2004), and ruling that habeas petitioner's claim was procedurally defaulted because "although the state trial court on collateral review addressed the merits of [the] claim, both the state appellate and supreme courts denied the claim pursuant to Mich. Ct. R. 6.508(D)"); *Alexander v. Smith*, 311 F.3d 875, 883-84 (6th Cir. 2009) (confirming that *Simpson* is binding precedent); *cf. Ivory v. Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007), *cert. den.* 128 S. Ct. 1897 (2008) (ruling that it may be appropriate to look to the state trial court's decision denying a motion for relief from judgment to determine whether the appellate courts relied upon a procedural default in denying relief pursuant to MCR 6.508(D)); *Abela v. Martin*, 380 F.3d 915, 921-23 (6th Cir. 2004) (distinguishing case where Michigan Court of Appeals denied relief for lack of merit in the grounds presented). In this case, the state trial and appellate courts relied upon clear state procedural default in denying Petitioner relief.

A state prisoner who fails to comply with a state's procedural rules waives the right to

federal habeas review, absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

Petitioner says that appellate counsel was ineffective -- as cause to excuse his failure to raise his claim challenging the trial court's factual findings on direct appeal. In order to establish ineffective assistance of counsel, Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). In determining whether counsel's performance was deficient,

> [t]he court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance .... At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690. Therefore, judicial scrutiny of counsel's performance must be "highly deferential." *Id*. at 689. The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The United States Supreme Court explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy .... Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner fails to show, that by omitting the claim challenging the trial court's factual findings presented in his motion for relief from judgment, appellate counsel's performance fell outside the wide range of professionally competent assistance. The prosecution presented significant evidence of Petitioner's guilt, including the victim's testimony, at trial. The record reveals that the trial court's findings were substantially consistent with the trial testimony. Accordingly, it was reasonable for appellate counsel not to challenge the trial court's decision in this manner. Appellate counsel presented potentially viable sentencing issues on direct appeal. Petitioner has not shown that appellate counsel's strategy in presenting such claims -- and not raising the claim contained in the motion for relief from judgment -- was deficient or unreasonable. Petitioner fails to demonstrate that appellate counsel was ineffective so as to establish cause to excuse his procedural default. He has likewise failed to show that he is entitled to habeas relief based upon his independent claim that appellate counsel was ineffective.

The Court need not address the issue of prejudice when a petitioner fails to establish cause

to excuse a procedural default. *See Smith*, 477 U.S. at 533; *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, the Court briefly notes that Petitioner's claim challenging the trial court's factual findings lacks merit. Michigan law requires a trial court conducting a bench trial to make specific findings of fact and conclusions of law. *See* Mich. Ct. R. 2.517(A)(1). A federal court, however, may grant an application for writ of habeas corpus only on the ground that the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). To the extent that Petitioner's challenges to the trial court's findings of fact are based on state law, they are not cognizable on habeas review. *See, e.g., Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Petitioner cites *Quercia v. United States*, 289 U.S. 466, 470 (1933), in support of this claim. The Supreme Court's concern in that case, however, was with a trial judge's comments on the evidence in front of a jury – which might improperly influence the jury to decide the case a certain way. *Quercia* is inapplicable, given that Petitioner proceeded with a bench trial. By law, the trial court was required to state its factual findings and conclusions of law in rendering its verdict. Federal courts generally may not reexamine a trial court's findings of fact, *Barclay v. Florida*, 463 U.S. 939, 968 (1983) (Stevens, J., concurring), peer over a state court's shoulder and second-guess its interpretation of facts, *Godfrey v. Georgia*, 446 U.S. 420, 450 (1980), or scrutinize the factfinder's reasoning process, *Jackson v. Virginia*, 443 U.S. 307, 319 n. 13 (1979). Findings of fact made by a state court "are presumed to be correct and can be contravened only if the habeas petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous." *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)); *see also Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) ("state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence").

Petitioner has made no such showing. He fails to show that the trial court's factual findings were so clearly erroneous that they must be rejected by this federal court on habeas review.

Petitioner essentially challenges the trial court's view of the evidence and witness credibility determinations. Such matters were for the finder of fact -- the trial court -- to decide. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). A trial court's assessment of credibility is generally beyond the scope of habeas review. The trier of fact has the responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic fact to ultimate facts," and a federal habeas court must defer to the trier of fact's resolution of conflicting evidence and inferences. *Jackson*, 443 U.S. at 319, 326. Habeas courts are not permitted to redetermine the credibility of witnesses whose demeanor was observed by the trial court. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Thus, although prosecution and defense witnesses offered somewhat differing views of the incident, the trial court had discretion to find that one set of witnesses offered a more credible explanation for what transpired during the altercation and shooting. Habeas relief is not warranted.

Petitioner also fails to demonstrate that a fundamental miscarriage of justice occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To be credible, such a claim of actual innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner makes no such showing. His habeas claims are thus barred by procedural default and/or lack merit, and do not

warrant relief.

## V. CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition. Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's dispositive decision, a certificate of appealability ("COA") must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37. When a district court denies a habeas claim on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *Slack*, 529 U.S. at 484-85.

The Court concludes that Petitioner failed to make a substantial showing of the denial of a constitutional right on his habeas claims, and fails to show that jurists of reason would find the Court's procedural default ruling debatable. The Court, therefore, **DENIES** a certificate of

appealability. The Court also concludes that any appeal would be frivolous. *See* Fed. R. App. P. 24(a). Accordingly, the Court **DENIES** Petitioner leave to proceed *in forma pauperis* on appeal.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: February 18, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record and Errol Hinton by electronic means or U.S. Mail on February 18, 2010.

s/Carol A. Pinegar
Deputy Clerk